# 11-3333-cv

## United States Court of Appeals
### for the
## Second Circuit
———◆❚◆———

MARVEL CHARACTERS, INCORPORATED, MARVEL WORLDWIDE,
INCORPORATED, MVL RIGHTS, LLC,

*Plaintiffs-Counter-Defendants-Appellees,*

WALT DISNEY COMPANY, MARVEL ENTERTAINMENT, INCORPORATED,

*Counter-Defendants-Appellees,*

— v. —

LISA R. KIRBY, NEAL L. KIRBY, SUSAN N. KIRBY, BARBARA J. KIRBY,

*Defendants-Counter-Claimants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLEES

R. BRUCE RICH
JAMES W. QUINN
RANDI W. SINGER
GREGORY SILBERT
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

DAVID FLEISCHER
HAYNES AND BOONE, LLP
30 Rockefeller Plaza, 26th Floor
New York, New York 10112
(212) 659-7300

*Attorneys for Plaintiffs-Counter-Defendants-Appellees
and Counter-Defendants-Appellees*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and to enable Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel of record for the non-governmental parties Plaintiffs-Appellees Marvel Worldwide, Inc., Marvel Characters, Inc., MVL Rights, LLC, Counterclaim-Defendants-Appellees Marvel Entertainment, LLC (successor by merger to Marvel Entertainment, Inc.) and The Walt Disney Company ("Disney") (collectively "Appellees") by their attorneys, certify that Marvel Worldwide, Inc., Marvel Characters, Inc. and MVL Rights, LLC are each indirectly wholly owned by Marvel Entertainment, LLC. Marvel Entertainment, LLC is wholly owned by The Walt Disney Company, the shares of which are publicly traded. The Walt Disney Company has no parent company and no publicly traded corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

COUNTERSTATEMENT OF THE ISSUES PRESENTED..................................4

STATEMENT OF THE CASE...............................................................................4

I.     STATEMENT OF FACTS ..........................................................................4

       A.     The Parties ......................................................................................4

       B.     Marvel Oversaw And Controlled The Creation Of Its
             Comic Books, Including The Works, From Conception
             To Publication ................................................................................6

             1.     Marvel's Oversight Of The Creation Process............................6

             2.     Marvel's Oversight Of The Submission And Revision
                    Process......................................................................................9

             3.     Marvel's Payments To Freelancers..........................................10

             4.     Kirby's And Other Marvel Freelancers'
                    Acknowledgment That Their Work Is Work Made For
                    Hire..........................................................................................11

       C.     The Termination Notices...............................................................11

II.    PROCEEDINGS BELOW ........................................................................12

SUMMARY OF ARGUMENT ............................................................................14

ARGUMENT .......................................................................................................18

I.     THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE
     WORKS WERE WORKS MADE FOR HIRE............................................18

       A.     The Law Governing Works Made For Hire Under The
             1909 Act Has Been Well-Established For Nearly A Half-
             Century .........................................................................................19

1. Development Of The Instance-And-Expense Test .................19

2. The Burden-Shifting Framework Of The Instance-And-Expense Test ..........................................................22

B. The Undisputed Evidence Demonstrates That The Works Were Created At Marvel's Instance ...................................24

1. Marvel Induced The Creation Of The Works And Maintained The Authority To Direct And Supervise Their Creation ..........................................................24

2. Appellants' Opposition Rests On An Unsustainable Reformulation Of The Instance Test .......................................26

a. Appellants' Attempted Reinvention Of The Instance Prong To Require A "Legal" Right To Supervise Is Legally Unsupported................26

b. Appellants Failed To Raise Any Genuine Issue Of Material Fact Regarding The Instance Prong ...................................................27

C. The Undisputed Evidence Demonstrates That The Works Were Created At Marvel's Expense ...................................30

1. The Works Were Made At Marvel's Expense Because Marvel Bore The Risk Of Profitability ...................................31

2. Appellants' Proposed Novel Expense Test Is Incorrect As A Matter Of Law....................................................32

D. Appellants Cannot Defeat Summary Judgment Merely By Impugning The Credibility Of Stan Lee.......................................36

E. Appellants Cannot Rebut The Presumption That The Works Are Works Made For Hire......................................37

1. Assignment Language In An Agreement Outside The Relevant Time Period Is Insufficient To Evince A Contrary Intent ..........................................................................38

2. Language In Check Legends Involving Third Parties And Outside The Time Period Is Insufficient To Show A Contrary Intent ..........................................................................41

F. The Exclusion Of Appellants' Proffered Expert Testimony Was Proper And Such Evidence Did Not In Any Event Create Any Material Issue Of Fact. .................................42

II. THE DISTRICT COURT CORRECTLY DENIED THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION ...................45

A. Personal Jurisdiction Over Lisa And Neal Kirby Is Proper Because This Litigation Arises From Their Purposeful Activity In New York ........................................45

B. Lisa And Neal Kirby Are Neither Necessary Nor Indispensable Parties .........................................................................52

CONCLUSION .........................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76 (2d Cir. 1993) .............................45

*Andy Stroud, Inc. v. Brown*, No. 08 Civ. 8246(HB), 2009 WL 539863
(S.D.N.Y. Mar. 4, 2009) .......................................................................48

*Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315 (S.D.N.Y.
2003) .............................................................................20, 27, 41

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 547 F.3d 109 (2d Cir. 2008)................55

*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082 (9th Cir.
2000) .......................................................................................49

*Beacon Enters., Inc. v. Menzies*, 715 F.2d 757 (2d Cir. 1983)...............................49

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999) .......................................41

*Brattleboro Publ'g Co. v. Winmill Publ'g Corp.*, 369 F.2d 565 (2d Cir.
1966) ........................................................................................20, 35

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .........................................50

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) .............................21

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156 (2d Cir. 2009)................55

*Cutco Indus., Inc. v. Naughton*, 806 F.2d 361 (2d Cir. 1986) ...........................46, 50

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005)....................................................42

*DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405 (S.D.N.Y.
2010) ........................................................................................48

*DNT Enters., Inc. v. Tech. Sys.*, 333 F. App'x 611 (2d Cir. 2009).........................50

*Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir.
2008) ........................................................................................49

iv

*Easter Seal Soc'y for Crippled Children & Adults of La. v. Playboy Enters.*,
815 F.2d 323 (5th Cir. 1987) ...................................................................21, 22, 33

*Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501 (2007) ........................................................50

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir.
2003) ...........................................................................................................*passim*

*Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, No. 00 Civ. 9569(DLC),
2002 WL 398696 (S.D.N.Y. Mar. 15, 2002) ...............................................*passim*

*Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV.
6143(DLC), 2010 WL 3564258 (S.D.N.Y. Sept. 10, 2010) .........................28, 38

*Fischbarg v. Doucet*, 9 N.Y.3d 375 (2007) ...........................................................46

*Forward v. Thorogood*, 985 F.2d 604 (1st Cir. 1993) .............................................21

*G.H. Bass & Co. v. Wakefern Food Corp.*, No. 91 Civ. 2683(RWS), 1991
WL 285622 (S.D.N.Y. Dec. 31, 1991) ...............................................................51

*Gross v. British Broad. Corp.*, 386 F.3d 224 (2d Cir. 2004) ....................................56

*Gwartz v. Jefferson Mem'l Hosp. Ass'n*, 23 F.3d 1426 (8th Cir. 1994) .................53

*Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005)................55

*Holland v. Fahnestock & Co.*, 210 F.R.D. 487 (S.D.N.Y. 2002)............................54

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257
(2d Cir. 2005).......................................................................................................36

*Levi Strauss & Co. v. Textiles Y Confecciones Europeas, S.A.*, 222 U.S.P.Q.
971 (S.D.N.Y. 1983) ............................................................................................51

*Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965) ..........20, 39

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651 (2d Cir.
1978) .....................................................................................................................51

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558
(S.D.N.Y. 2007) .................................................................................42

*Madden v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 889
F. Supp. 707 (S.D.N.Y. 1995) ..........................................................46

*Mark E. Mitchell, Inc. v. Charleston Library Soc'y*, 114 F. Supp. 2d 259
(S.D.N.Y. 2000) .................................................................................53

*Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Center of
Contemporary Dance, Inc.*, 380 F.3d 624 (2d Cir. 2004) ......................20, 23, 24

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002).................22, 39, 40

*In re Marvel Entm't Group, Inc.*, 254 B.R. 817 (D. Del. 2000) ......................*passim*

*Mastercard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377 (2d Cir.
2006) .................................................................................................53

*Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70 (S.D.N.Y. 2006) .........52

*McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272 (2d Cir.
1999) .................................................................................................36

*Murray v. Gelderman*, 566 F.2d 1307 (5th Cir. 1978) ................................21, 22, 31

*Nat'l Ctr. for Jewish Film, Inc. v. Goldman*, 943 F. Supp. 113 (D. Mass.
1996) .................................................................................................27

*Nat'l Sun Indus., Inc. v. Dakahlia Commer. Bank*, No. 95-7961, 1997 WL
218789 (2d Cir. May 2, 1997) ...........................................................50

*Nimely v. City of N.Y.*, 414 F.3d 381 (2d Cir. 2005).................................43

*PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) .............................45

*Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir. 1972).................*passim*

*Playboy Enters., Inc. v. Dumas*, 53 F.3d 549 (2d Cir. 1995)...........................*passim*

*Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710 (S.D.N.Y. 1997) .....................35

*Plunket v. Estate of Doyle*, No. 99 Civ. 11006(KMW), 2001 WL 175252
(S.D.N.Y. Feb. 22, 2001) ....................................................................................56

*Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493 (2d Cir. 1977).................55

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...............43

*Seitz v. DeQuarto*, 777 F. Supp. 2d 492 (S.D.N.Y. 2011).......................................30

*Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036 (C.D. Cal. 2009)...*passim*

*Spiegel v. Schulmann*, 604 F.3d 72 (2d Cir. 2010) ..................................................37

*Sternberg v. Nathan*, No. 96-9232, 1997 WL 225895 (2d Cir. May 7, 1997) ........50

*Toledo Peoria & Western Ry. Corp. v. Southern Ill. Railcar Co.*, 84 F. Supp.
2d 340 (N.D.N.Y. 2000) ...............................................................................49, 50

*Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869 (9th Cir.
2005) .........................................................................................................*passim*

*Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 312
F.3d 82 (2d Cir. 2002) .......................................................................................54

*Wales Indus., Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510 (S.D.N.Y.
1985) ...................................................................................................................56

*Washington v. Daley*, 173 F.3d 1158 (9th Cir. 1999)..............................................53

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004)......................................43

**STATUTES**

17 U.S.C. § 26 (1909) ................................................................................................19

17 U.S.C. § 102(b) .....................................................................................................29

17 U.S.C. § 304(c) .............................................................................................*passim*

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Fed. R. Civ. P. 19 ...........................................................52, 53, 54

C.P.L.R. § 302(a)(1)............................................................18, 46

N.Y. Tax Law § 1106..............................................................41

**OTHER AUTHORITIES**

4 James W. Moore et al., Moore's Federal Practice (3d ed. 2011) ...................53, 54

7 Charles Alan Wright et al., Federal Practice & Procedure (3d ed. 2011) ......53, 56

## PRELIMINARY STATEMENT

For more than forty-five years, this Court has applied a uniform standard to determine whether copyrighted works constitute works made for hire under the Copyright Act of 1909 ("1909 Act"). If the work was made at an employer's "instance and expense," it so qualifies and the employer is the "author" and copyright owner of that work for the duration of its copyright term. Applying this settled test to the undisputed facts in this appeal permits only one, dispositive, conclusion: The contested works are works made for hire, entitling Plaintiffs-Appellees (collectively, with their predecessors-in-interest, "Marvel") to continue to exploit them unimpaired in accord with Marvel's long-held expectations and enormous investments in them.

Defendants-Appellants, four siblings whose father, Jack Kirby, contributed as a freelance artist to Marvel comic books, dispute the work-for-hire status of Kirby's contributions to certain works developed between 1958 and 1963. They contend that Marvel cannot meet the instance-and-expense test; that Kirby was the author of his contributions and merely assigned copyright rights in them to Marvel; and that, by operation of Section 304(c) of the Copyright Act of 1976 (the "1976 Act"), as Kirby's statutory heirs, they are entitled to terminate those assignments beginning effective 2014. Acting opportunistically on this premise, two weeks after The Walt Disney Company announced its agreement to acquire Marvel

Entertainment, Appellants served self-executing termination notices on Marvel and numerous licensees (the "Termination Notices").  The determination of the work-for-hire status of the contributions listed in the Termination Notices is critical, as Section 304(c) expressly exempts works made for hire from termination.

As the district court (McMahon, J.) correctly reasoned, any Marvel comic books in which Kirby's contributions appear were created at Marvel's *instance* because Marvel assigned the work to its writers and artists (including Kirby, who indisputably "didn't work on spec" and never began to draw until after he spoke with Marvel's editor), and supervised and controlled its completion.  The works were made at Marvel's *expense* because Marvel alone bore the financial risk associated with their success or failure, whereas Kirby received a fixed, per-page amount for each contribution.  Under this Court's unbroken line of precedents, this showing created an "almost irrebuttable presumption" that Kirby's contributions were works made for hire.  To overcome that presumption, Appellants were required to come forward with unequivocal evidence of an express agreement between the parties to the contrary.  As the district court recognized, Appellants failed utterly to do so.

Appellants resort instead to a critique of established law.  They do not so much challenge the governing standards as seek to rewrite them.  Citing commentary as opposed to actual precedent, and impermissibly attempting to

engraft the entirely different work-for-hire test embodied in the 1976 Act (applicable solely to works created on or after January 1, 1978) onto the works here in issue, Appellants grasp for interpretations of the instance-and-expense test that simply do not reflect settled law. And while they vociferously impugn the credibility of former Marvel editor Stan Lee, they fail to point to any evidence that could create a disputed issue of material fact concerning whether Marvel has met the instance-and-expense test – especially given the consistency of Lee's testimony here with statements he has made over some fifty years, as well as with the testimony of the remaining individuals with actual knowledge of the facts.

Appellants also mount a misguided challenge to personal jurisdiction, claiming that, because two siblings live in California and two in New York, none can be sued in either jurisdiction unless the non-residents consent, and they consent only to suit in California. This claim fails because the California Appellants projected themselves into New York by serving Termination Notices here on Marvel and its licensee, which purported automatically to divest Marvel of its rights to Kirby's contributions unless Marvel took action. In any event, the presence of the California Appellants makes no practical difference whatsoever; they are neither necessary nor indispensable parties to this action. Their New York siblings, represented by the same counsel, have championed the identical interests. Dismissing the California Appellants would not, as they urge, start the entire

litigation over in California; the final judgment in this action would remain, with a slightly different caption.

## COUNTERSTATEMENT OF THE ISSUES PRESENTED

1.     Did the district court correctly hold that the Works (as defined below) were made at Marvel's instance and expense, and thus are works made for hire under the 1909 Act, based on (a) Marvel's right to supervise, direct and control the manner in which the Works were created; (b) Marvel's payment to Kirby of a fixed, per-page amount for each of his completed contributions; and (c) an absence of record evidence evincing an agreement between Marvel and Kirby that his contributions to the Works were intended not to be works-for-hire?

2.     Did the district court properly deny Appellants' motion to dismiss for lack of personal jurisdiction and failure to join indispensable parties where the California-based Appellants projected themselves into New York by serving Termination Notices on Marvel and its licensee in New York, and where this action can be fully and fairly adjudicated even in their absence?

## STATEMENT OF THE CASE

## I.     STATEMENT OF FACTS

### A.     The Parties

For generations, Marvel has published many of American popular culture's most cherished comic book stories.  From 1958 to 1963 (the "Time Period"), under

the leadership of owner and publisher Martin Goodman and editor Stan Lee, Marvel introduced some of its most well-known publications, including *The Fantastic Four*, *The Incredible Hulk*, *Iron Man*, *The X-Men* and *The Avengers* (collectively, with all works at issue, "the Works").  JA(I)152-185 ¶8.[1]  Together, Goodman and Lee on behalf of Marvel oversaw and directed the entire creation process of Marvel's comic books, establishing a legacy that remains part of American culture today.  *See id.* ¶¶14-15, 22-27, 30-32, 34.

Since its inception as Timely Comics in the 1930s and through the Time Period, Marvel maintained its headquarters in New York City.  JA(I)81 ¶5.  To this day, the center of Marvel's publishing business is New York, where all creative and executive decision-making relating to comic-book publications occurs.  *Id.* ¶¶6, 8.

Appellants are the children and statutory heirs of Jack Kirby, an artist who contributed pencil drawings to numerous Marvel comic books at various times from approximately 1940 until his death in 1994.  JA(I)152-185 ¶¶2-4. Throughout the Time Period, Kirby lived and worked in New York, where

---

[1] The Works comprise 262 published works (including story lines, characters and other copyrightable elements contained therein) identified in the Termination Notices as purportedly being subject to termination.  *Id.* ¶8.  However, certain of the characters or elements identified in the Termination Notices were first published outside of the Time Period.  For example, "Namor the Sub-Mariner" was a character first drawn by Bill Everett and first published in Marvel Comics No. 1 in 1939.  JA(IV)1058.  Likewise, "Silver Surfer" made its first appearance in the pages of *The Fantastic Four*, Issue No. 48, in 1966.  JA(I)152-185 ¶108.

Appellants also lived.  JA(I)81 ¶7; JA(I)152-185 ¶¶5, 109-112.  Today, Appellants

Lisa and Neal Kirby reside in California; Appellants Susan and Barbara Kirby

reside in New York.  JA(I)68 ¶2; JA(I)72 ¶2; SA59.

### B. Marvel Oversaw And Controlled The Creation Of Its Comic Books, Including The Works, From Conception To Publication

During the Time Period, Goodman ran Marvel's comic-book business.  Lee

and Goodman directed every aspect of the business, from conception through

publication – Goodman managed the business at the higher level, while Lee

supervised its day-to-day operations.  JA(I)152-185 ¶¶14-15, 21-27, 30-32, 34.  At

all times, Lee answered to Goodman, who was the "ultimate boss" and was

ultimately responsible for all of Marvel's publications.  *Id.* ¶¶15-16.  Although Lee

was paid as a freelancer for his writing, in his capacity as editor, he was a salaried

Marvel employee.  *Id.* ¶¶17-18.  As editor, Lee's responsibilities included

overseeing the creative direction and all other aspects of Marvel's comic books,

characters and stories, both by executing Goodman's ideas for comic books and by

originating concepts himself.  *Id.* ¶22.

### 1. *Marvel's Oversight Of The Creation Process*

Lee oversaw all creative and editorial aspects of every comic book Marvel

published during the Time Period.  *Id.* ¶23.  Although the process for creating

Marvel's comic books evolved over time, certain aspects remained unaltered.  For

example, Lee always decided which artists would contribute to which comic

books, assigned them to those tasks, and instructed them on what they should draw. *Id.* ¶¶24, 27. It is undisputed that this direction could take two forms: Sometimes, artists were provided detailed scripts composed by assigned writers based on Lee's concepts, complete with panel-by-panel descriptions of the action and visuals, dialogue and captions.[2] *Id.* ¶36. Other times, under what came to be known as the "Marvel Method," Lee provided a written or oral outline or synopsis of the story, and after discussing it in a "plotting conference," the artist proceeded to draw a complete story based on Lee's instructions.[3] *Id.* ¶¶37, 54. After the artist's pencil drawings were submitted (and passed through Marvel's revision process), the assigned writer wrote captions and dialogue to complete the story. *Id.* ¶37. Under either approach, every Marvel comic book during the Time Period began with Lee's conceptual input, and assigned artists never put pencil to paper until Lee provided them with either a script or synopsis. *Id.* ¶¶36-37, 39, 54-55.

While the Marvel Method afforded artists freedom to flesh out comic book plots, artists were at all times constrained to keep to the main themes, plot and

---

[2] During the Time Period, Lee wrote most Marvel scripts; if he did not write them himself, Lee provided the assigned writer with a plot outline or synopsis to be incorporated into the script. *Id.* ¶¶27, 36

[3] The Marvel Method developed when the workload in Marvel's comic book publishing division increased and Lee realized he could not write scripts quickly enough to keep all of Marvel's artists busy. *Id.* ¶38. Marvel's freelance artists were paid for each completed page they submitted for publication, so Lee devised the Marvel Method to accelerate the process and keep Marvel's freelancers working. *Id.*

instructions supplied to them, and Marvel maintained ultimate control over all work. *Id.* ¶¶40-43. As an anticipated part of performing a specific assignment under Marvel's supervision, an artist occasionally would propose embellishing the project with a new character or storyline. *Id.* ¶¶41, 57. What came of such ideas was entirely within Marvel's discretion; no character or storyline so developed ever appeared in a published comic book unless it was reviewed, adapted as appropriate, and approved by Marvel. *Id.* ¶¶42.

Consistent with these practices, each of Kirby's contributions to the Works began with Lee's assignment and guidance in a detailed script, synopsis or plotting conference. *Id.* ¶¶54, 82-88, 97-105. For example, Kirby drew the first issue of *The Fantastic Four* based on direction from Lee at a plotting conference and he drew the first stories to feature Thor and Ant-Man based on detailed scripts written by Larry Lieber that in turn were based on Lee's plot synopses. *Id.* ¶¶82, 88, 101. Under either approach, Kirby never began any artwork for a Marvel comic book unless and until Lee assigned him to do so. *Id.* ¶¶54-55, 64. As Appellant Neil Kirby concedes, Kirby "didn't do work on spec." *Id.* ¶¶55, 64, 115.

Each Marvel comic book during the Time Period reflected the efforts of numerous contributors beyond the pencil artist and writer. Marvel stitched together, supervised and coordinated the work of letterers, inkers, engravers and

colorists, all of whom performed their specialized tasks pursuant to assignments from, and deadlines imposed by, Lee.  *Id.* ¶¶26-30.

## 2.    *Marvel's Oversight Of The Submission And Revision Process*

Marvel at all times retained final authority to determine what work would be published, and Lee had the final say on all artwork and dialogue.  All of Marvel's freelance artists and writers, including Kirby, were required to report to Lee and to abide by his "marching orders."  *Id.* ¶¶23, 58-59, 66-67.  No comic book was published unless Lee and Goodman approved it.  *Id.* ¶¶15-16, 30-31.

Lee exercised Marvel's authority to supervise and direct the production of its comic books by requiring all artwork and writing to be submitted for his review and, where warranted, by requiring revisions.  *Id.* ¶¶27, 30, 32, 34-35, 40, 43, 58. Lee requested changes to artwork if, for example, he felt that it lacked sufficient action or was confusing to the reader.  *Id.* ¶32.  Often, minor changes were made without consulting the original artist.  *Id.* ¶¶33, 60.  Likewise, Lee had the final say on all plots and dialogue, which he preferred to write in his own voice and style. *Id.* ¶¶31, 37, 40, 56, 63.

Like all freelancers, Kirby was required to submit his artwork to Lee for review and, at Lee's discretion, sometimes was instructed to make revisions.  *Id.* ¶¶58-59.  Kirby never refused to do so.  *Id.* ¶59.  Occasionally, Lee asked other artists to make changes to Kirby's work.  *Id.* ¶60.

Lee also had the authority to reassign artists and writers as he deemed appropriate and frequently exercised that authority during the Time Period.  *Id.* ¶¶24-25.  Specifically with respect to the creation of Spider-Man, Lee at first assigned Kirby to draw the story.  *Id.* ¶90.  When Kirby's sketches did not fit Lee's vision for the "nerdy" teenaged hero, Lee replaced Kirby with Steve Ditko, whose artwork was featured in the first Spider-Man story in *Amazing Fantasy*, No. 15.  *Id.*

### 3.  *Marvel's Payments To Freelancers*

During the Time Period, Marvel always paid freelance artists and writers a flat agreed per-page rate for the assigned work they completed and submitted.  *Id.* ¶¶45, 62.  Neither Kirby nor any other freelancer ever was paid royalties or any other profit participation during the Time Period, and Marvel did not purchase – and Kirby did not produce – artwork on speculation.  *Id.* ¶¶46, 49, 64.

Kirby was paid for all the completed artwork pages he submitted to Marvel during the Time Period, regardless of whether changes were required or, in rare cases, a submission was not published.  *Id.* ¶¶47-48, 61.  Kirby and other freelancers were paid for work long before the completed book was published; their payment was unrelated to the success of the book in the marketplace.  *Id.* ¶20. If a particular comic book did not sell well or lost money, Marvel alone bore the financial consequences.  *Id.* ¶19.

### 4. *Kirby's And Other Marvel Freelancers' Acknowledgment That Their Work Is Work Made For Hire*

On numerous occasions, Marvel artists and writers – including Kirby – have acknowledged that their contributions to Marvel comic books were as works made for hire. *Id.* ¶¶10, 50-53, 68-75. Kirby himself signed multiple agreements and sworn statements, and made many additional public statements, that confirm his understanding of the work-for-hire nature of his contributions. *Id.* ¶¶68-75. These acknowledgements include an affidavit Kirby signed in 1966 concerning Captain America (not at issue here, but also featuring Kirby's artwork) in which he stated "whatever [he] did for [Marvel] belonged to [Marvel] as was the practice in those days." *Id.* ¶69. Kirby also stated in numerous interviews and public statements shortly after the Time Period that his work was work-for-hire, subject to Marvel's authority and editorial control. *Id.* ¶¶66-68. To the extent Kirby himself ever had any dispute with Marvel regarding his contributions to Marvel's comic books, he and his representatives repeatedly made clear that their concern was proper credit and not copyright ownership. *Id.* ¶¶76-77.

### C. The Termination Notices

On August 31, 2009, The Walt Disney Company ("Disney") announced its agreement to acquire Marvel Entertainment, Inc. *Id.* ¶6. Two weeks later, Appellants served 45 Termination Notices on Marvel, Disney and various other entities. *Id.* ¶7. Each of the 45 Termination Notices was served in New York on

11 Marvel companies, including Marvel Publishing, Inc. (the former name of Appellee Marvel Worldwide, Inc.). Supp A-23-67; Supp A-1-2. The Termination Notices claim to exercise a right under section 304(c) of the 1976 Act to terminate an alleged assignment from Kirby to Marvel of the copyrights in Kirby's contributions to the Works. JA(I)152-185 ¶¶7-9, 11. They purport to take effect automatically to divest Marvel of certain rights beginning in 2014. *Id.* ¶11.

## II. PROCEEDINGS BELOW

Marvel filed this action on January 8, 2010 seeking a declaratory judgment that the Termination Notices were void because Section 304(c) terminations apply only to assignments and licenses, not to works (such as the Works) made for hire. JA(I)19-35. Appellants moved to dismiss the action, asserting there was no personal jurisdiction over Lisa and Neal Kirby and the action could not proceed without them.

On April 14, 2010, the district court denied the motion to dismiss, finding it had personal jurisdiction over Lisa and Neal Kirby (thus not reaching the issue of whether they were indispensable parties). Applying New York's long-arm statute, the court held that Appellants had "transacted business" by mailing hundreds of Termination Notices into New York, thus "project[ing] themselves into New York and into the local commerce." SA58-59. The court also observed: "Defendants'

attempt to dictate the forum for this litigation by choosing which Defendants will consent to which jurisdiction offends equity and fairness."  SA67.

Appellants then asserted a variety of counterclaims, all of which the district court dismissed save for the claim asserted against Marvel and Disney for a declaration that the Termination Notices were valid.  After extensive discovery, the parties cross-moved for summary judgment and, on July 28, 2011, the district court granted Marvel's and Disney's summary judgment motion and denied Appellants' motion.  The court denied Marvel's and Disney's motion to strike certain evidence, but granted its motions to exclude the proffered expert testimony of Mark Evanier and John Morrow, finding both "experts" lacked personal knowledge and instead had proffered factual narratives based on secondary sources, and were mere "conduit[s] for introducing hearsay."  SA13.  Moreover, the testimony addressed "lay matters which the trier of fact is capable of understanding and deciding without the expert's help," and sought to usurp the factfinder's role by purporting to opine about intent, motivations, and credibility.  SA13-15.  The district court, nevertheless, expressly noted that even if the "expert" testimony were considered, summary judgment in Marvel's favor would still be appropriate.  SA32 n.3 & SA34 n.4.

The court undertook a searching review of the record, expressly relying on a panoply of testimony and other evidence from Lee and others, as well as

Appellants' own witnesses and numerous other sources, in concluding that the material facts were undisputed. SA15-23. Relying on undisputed facts, the district court concluded the Works were created at Marvel's instance because, among other reasons, "Kirby did not create the artwork that is the subject of the Termination Notices until Lee assigned him to do so" and "Lee supervised the creation of Marvel's comic books from conception to publication." SA31-33. The court determined the Works were created at Marvel's expense because Kirby was paid a fixed per-page rate for his completed assignments and because "Kirby took on none of the risks of the [Works'] success." SA35-39. Finally, the court held that Appellants had failed to rebut the resulting work-for-hire presumption because neither a 1972 agreement between Kirby and Marvel nor any other later-in-time agreements or check legends evinced an unambiguous mutual intent that the Works were not works made for hire. SA39-51.

### SUMMARY OF ARGUMENT

I.      The Termination Notices are a nullity since the Works were created as works made for hire, and hence are not subject to termination. *See* 17 U.S.C. § 304(c). Nearly a half-century of uniform case law in this Circuit and elsewhere has established the instance-and-expense test under the 1909 Act that governs the work-for-hire determination. The test is met when the employer was the

"motivating factor" that "induced the creation" of the work. *Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995).

This test is unequivocally met here. Marvel instanced the Works because Kirby did not render his contributions until after Marvel assigned him to do so, and only after Marvel editor Lee provided him with a detailed script, synopsis or plotting conference addressing the story to be illustrated. Additionally, Marvel supervised and controlled Kirby's performance of each assignment, and had sole discretion to accept, reject, or modify submitted work. This supervisory authority is the "hallmark" of works made for hire. *Id.*

Unable to challenge these dispositive facts, Appellants posit a perplexing instance standard by which Marvel's very right to exercise control over Kirby's work product – and its theoretical ability to reject submissions as incomplete or require modifications to them – converted Marvel into a mere "purchaser" of the work. This construct has no application to the instance test – indeed, by its own logic, would eviscerate it.

Marvel also unequivocally satisfied the expense requirement of the work-for-hire test. This Court has already determined that an employer meets this requirement simply by paying a fixed sum to a hired party for completed assignments, *id.* at 555, which is undisputedly what occurred here. Marvel paid Kirby a fixed page rate for each of his contributions, irrespective of whether

Marvel actually used them and independently of how they performed in the marketplace. Marvel alone bore the financial risk of the Works' profitability.

Again unable to contest the straightforward application of the record facts to governing law, Appellants attempt to revamp it. Confusing the risk of non-acceptance of Kirby's contributions with the overall risk of creation of the Works, Appellants contend that the theoretical possibility that Kirby might not have been paid if his contribution was rejected means the Works as a whole were created at his, not Marvel's, expense. Appellants' construct is both factually ungrounded, because Kirby always was paid for his contributions, and also lacking in any legal support. Indeed, adoption of Appellants' proposed test – which would require Marvel to have committed to accepting and paying for freelance work sight unseen and without regard for its quality or completeness in order to be deemed to have had it created at its expense – would undermine the instance test, which entails a demonstration of the right to exercise just such control over a developing work. This "heads Appellants win, tails Marvel loses" paradigm suits Appellants but contradicts decades of precedent.

Because Marvel satisfied the instance-and-expense test, there is an "almost irrebuttable presumption" that the Works were works made for hire. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 158 (2d Cir. 2003) ("*Hogarth*"). Appellants could overcome this presumption only by establishing

through contemporaneous evidence that, even though Marvel induced the Works and bore the risk of loss, both parties expressly and unequivocally intended that copyright rights in Kirby's contributions would vest in Kirby. They cannot meet this burden. The 1972 agreement between Kirby and Marvel on which Appellants principally rely cannot retroactively provide evidence of such intent. Regardless, that agreement expressly concedes that Kirby's contributions to the Works were made "as an employee for hire." Neither can the necessary contrary intent be deduced from Appellants' remaining claimed source: legends on checks from other time periods payable to other contributors.

The district court also properly exercised its discretion in excluding the "expert" testimony proffered by Appellants because those witnesses were merely conduits to introduce inadmissible hearsay and to opine improperly on other witnesses' credibility. Nonetheless, as the district court found, the testimony of both "experts," if considered, would corroborate the salient facts.

II.     Appellants' attempt to dismiss the action because personal jurisdiction is supposedly lacking over two defendants fails. The two Appellants who do not reside here projected themselves into New York by serving 45 Termination Notices on 11 Marvel entities (and serving several notices on a Marvel licensee) in New York, disrupting Marvel's New York-based publishing business and its relations with longstanding business partners in an effort to arrogate to themselves

the right to receive significant royalties.  These purposeful activities constitute

"transacting any business" within New York, and subject the California-based

Appellants to long-arm jurisdiction.  C.P.L.R. § 302(a)(1).

In any event, the California Appellants need not be joined because their

interests would not be thwarted by their absence.  The same counsel would press

(and, indeed, has pressed) the same arguments on behalf of the New York siblings,

whose interests are identical.  The action would continue without the California

Appellants – especially now that it has proceeded to final judgment and economy

and efficiency concerns are paramount.  It is simply incorrect, as Appellants urge,

that they can be sued only where all four siblings "consent" to appear together.

## ARGUMENT

## I.  THE UNDISPUTED EVIDENCE DEMONSTRATES THAT THE WORKS WERE WORKS MADE FOR HIRE

Each of the Works named in the Termination Notices was published prior to

January 1, 1978 – the effective date of the 1976 Act – so the 1909 Act and the case

law construing it govern the core legal issue in this action.  *E.g.*, *Playboy*, 53 F.3d

at 553.  Appellants rely on a provision in the 1976 Act that entitles the author of a

work governed by the 1909 Act (or his statutorily-defined heirs) to terminate a

prior copyright assignment a prescribed number of years after the copyright was

originally secured.  17 U.S.C. § 304(c).  Critically, this provision is expressly

*inapplicable* to works made for hire.  *Id.* (providing for termination of transfers of

copyrights "other than a copyright in a work made for hire").  Congressional

recognition of the inapplicability of termination rights to works made for hire

acknowledges such copyrights "never belonged to the artist in the first instance to

grant; instead, [they] belonged at the outset to the party that commissioned the

work."  *Siegel v. Warner Bros. Entm't Inc.*, 658 F. Supp. 2d 1036, 1056 (C.D. Cal.

2009).  Accordingly, if, as the district court correctly determined, the Works

qualify as works made for hire, the Termination Notices have no legal force.

### A. The Law Governing Works Made For Hire Under The 1909 Act Has Been Well-Established For Nearly A Half-Century

As they were created in the 1958 to 1963 period, the Works continue to

enjoy copyright protection as works of authorship under the 1909 Act.  The 1909

Act provides that "[t]he word 'author' shall include an employer in the case of

works made for hire," 17 U.S.C. § 26 (1909), but does not define the term "work

made for hire."  Its contours have, nonetheless, now been clearly delineated by

subsequent judicial precedents, led by this Court and the Ninth Circuit.

#### 1. Development Of The Instance-And-Expense Test

This Court, construing the 1909 Act, has held that when an employer hired

an employee or contractor to create a work, there arose a presumption that "the

copyright shall be in the person at whose instance and expense the work is done."

*Playboy*, 53 F.3d at 554.  The instance-and-expense test is satisfied "when the

motivating factor in producing the work was the employer who induced the

creation." *Id.*; *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972).

The Ninth Circuit was the first court explicitly to apply the 1909 Act's work-for-hire doctrine beyond the context of traditional employees, to works commissioned from independent contractors. *See Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298, 300 (9th Cir. 1965). This Court did so one year later, in *Brattleboro Publishing Co. v. Winmill Publishing Corp.*, 369 F.2d 565, 567-68 (2d Cir. 1966) ("We see no sound reason why these same principles are not applicable when the parties bear the relationship of employer and independent contractor.").[4] This Court has reaffirmed the applicable framework in numerous subsequent cases involving independent contractors, including *Picture Music*, 457 F.2d at 1216, *Playboy*, 53 F.3d at 554, *Hogarth*, 342 F.3d at 158-61, and *Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 634-35 (2d Cir. 2004).

---

[4] Appellants incorrectly suggest that the work-for-hire doctrine cannot be "retroactively impute[d]" to works made before *Lin-Brook* and *Brattleboro*. Br. 50. In fact, numerous courts, including this one, have applied the instance-and-expense test to pre-1966 works created by independent contractors. *E.g.*, *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 877 (9th Cir. 2005) (book published in 1948); *Picture Music*, 457 F.2d at 1216-17 (song published in 1933); *Archie Comic Publ'ns, Inc. v. DeCarlo*, 258 F. Supp. 2d 315, 328 (S.D.N.Y. 2003) (comic book published in 1962), *aff'd*, 88 F. App'x 468 (2d Cir. 2004).

Thus, it is now well-settled that "an independent contractor is an 'employee' and a hiring party an 'employer' for purposes of the [1909 Act's work-for-hire doctrine] if the work is made at the hiring party's 'instance and expense'"; that is, the instance-and-expense test applies equally to independent contractors and traditional employees. *Playboy*, 53 F.3d at 554; *see also Twentieth Century*, 429 F.3d at 877; *Forward v. Thorogood*, 985 F.2d 604, 606 (1st Cir. 1993); *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir. 1978).

Appellants attempt to avert application of this doctrine to the Works by inaptly relying on *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ("*CCNV*"), Br. 55. *CCNV* discussed the entirely separate work-for-hire doctrine as re-formulated under the 1976 Act, which applies only to works created after 1977. *Cf. Easter Seal Soc'y for Crippled Children & Adults of La. v. Playboy Enters.*, 815 F.2d 323, 334-35 (5th Cir. 1987) (noting 1976 Act represented a "radical break" from 1909 Act's work-for-hire doctrine). The notion that the *CCNV* Court modified the 1909 Act instance-and-expense test – an issue not before it – was, as Appellants themselves acknowledge, Br. 55, considered and rejected by this Court in *Hogarth*. *See* 342 F.3d at 162-63 (concluding *CCNV* does not "relieve us from our obligation to follow *Picture Music* and *Playboy*").[5] No

---

[5] Appellants repeatedly strain to support their arguments with the perspectives of selected commentators, as opposed to this Court's (and other Circuits') actual holdings. Indeed, in reaching its clear holding with respect to *CCNV*'s lack of

court has disagreed, and the Ninth Circuit has specifically concurred.  *See Twentieth Century*, 429 F.3d at 878.[6]

### 2. The Burden-Shifting Framework Of The Instance-And-Expense Test

It is initially Marvel's burden to come forward with "some credible evidence" that the Works were created at its instance and expense.  *Id.* at 877. From this showing, there arises an "almost irrebuttable presumption" that the Works were works made for hire.  *Hogarth*, 342 F.3d at 158; *Easter Seal*, 815 F.2d at 327.  To overcome it, Appellants must prove by a preponderance of the evidence that an express agreement existed between Marvel and Kirby evincing their mutual intent that the Works would *not* be so treated, *Playboy*, 53 F.3d at 554-55; *see Twentieth Century*, 429 F.3d at 881; *Murray*, 566 F.2d at 1309, which agreement must be contemporaneous with the work's creation and not later in time, *see Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 290-91 (2d Cir. 2002).

---

guidance on the 1909 Act work-for-hire analysis, this Court rejected Professor Nimmer's views as unpersuasive and unsupported in this Circuit's jurisprudence. *See id.* at 161.

[6] Similarly groundless is Appellants' assertion that the work-for-hire doctrine should apply "more narrowly" here because the case arises in the § 304(c) termination context, instead of the "copyright ownership" context.  *See* Br. 55-56. They fail to explain why and the law is to the contrary.  *E.g.*, *Siegel*, 658 F. Supp. 2d at 1041; *see Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, No. 00 Civ. 9569(DLC), 2002 WL 398696, at *1 (S.D.N.Y. Mar. 15, 2002) (applying instance-and-expense test to determine succession of rights under § 304), *aff'd*, 342 F.3d 149.

Appellants misconstrue this framework, repeatedly asserting that Marvel somehow failed to demonstrate the parties' affirmative intent that the Works be treated as works made for hire. Br. 46. But it is the *hired party* – Appellants – who must present evidence of intent, once the burden has shifted, to show the parties expressly intended the copyright to vest in the contractor and not the employer. Indeed, the cases on which Appellants rely for the proposition that the 1909 Act turns on 'the mutual intent of the parties'" are miscited; they actually explain there is a "*presumption . . . that the mutual intent of the parties* is that the title to the copyright shall be in the person at whose instance and expense the work is done." *Martha Graham*, 380 F.3d at 634 n.17 (emphasis added); *see also Twentieth Century*, 429 F.3d at 877 (same); *Playboy*, 53 F.3d at 556-57 (same). Thus, Kirby's purported lack of intent that his work be deemed work-for-hire (of which there is no record evidence) is irrelevant, as is testimony from Appellants' witnesses that they did not view their contributions – none of which are at issue here – to be works made for hire. *See* JA(V)1375 ¶13; JA(V)1382 ¶15; JA(VI)1388 ¶13; JA(VI)1392-93 ¶¶8-9; CA(I)4-5 ¶12.

**B.** **The Undisputed Evidence Demonstrates That The Works Were Created At Marvel's Instance**

**1.** *Marvel Induced The Creation Of The Works And Maintained The Authority To Direct And Supervise Their Creation*

The undisputed record leaves no question that all of the Works were created at Marvel's instance. Under this Court's binding precedent, the essential element in determining whether a work was created at the hiring party's instance is that party's right to direct and supervise the manner in which the work was performed. *E.g.*, *Playboy*, 53 F.3d at 554; *see also Twentieth Century*, 429 F.3d at 879. The hiring party need not actually exercise this right; rather, the core consideration is whether the hiring party had the authority to do so. *E.g.*, *Martha Graham*, 380 F.3d at 635; *Playboy*, 53 F.3d at 554 ("[T]he hallmark of an 'employment for hire' is whether the employer *could have* exercised the requisite power to control or supervise the creator's work.") (emphasis added; citation omitted). Appellants do not – and cannot – dispute that where a hiring party "took the initiative in engaging" the artist and "had the power to accept, reject, or modify [his] work," the work is created at its instance. *Picture Music*, 457 F.2d at 1217.

Here, it is undisputed that Marvel had – and frequently exercised – the authority to supervise production of all of its comic books, including the Works. Artists – including Kirby – never put pencil to paper on any of the Works until Marvel assigned them to do so and provided them with guidance on the story in a

detailed script, a synopsis or a plotting conference. JA(I)152-185 ¶¶39, 54-55, 64.

This assignment process alone is sufficient to satisfy the instance prong. *See*

*Playboy*, 53 F.3d at 556 (works pursuant to specific assignments created at

magazine's instance); *Hogarth*, 2002 WL 398696, at *19 (artwork at hiring party's

instance where artist "would not have undertaken production of artwork for the

Books . . . without receiving the assignment from ERB to do so"); *In re Marvel*

*Entm't Group, Inc.*, 254 B.R. 817, 830 (D. Del. 2000) (comic book writer's work

pursuant to specific assignments was at publisher's instance).

　　Additional undisputed evidence further compels the conclusion that the

Works were created at Marvel's instance. During the Time Period, Marvel

engaged and supervised all contributors to its comic books and ensured all

components of these works were completed by specific deadlines. JA(I)152-185

¶¶15, 23-27, 30. As Appellants concede, all artwork was subject to Lee's review,

and collectively Lee and Goodman had the "final say" on all the material Marvel

published in its comic books. *Id.* ¶¶15-16, 30-31; *see* Br. 44. Marvel also

exercised its supervisory authority by sometimes requiring revisions to work

submitted, JA(I)152-185 ¶32, reassigning artists, *id.* ¶25, deciding not to publish

certain work, *id.* ¶43, and canceling unsuccessful comic book series, *id.* ¶21. It is

undisputed that each of these aspects of Marvel's supervisory authority applied

equally to Kirby and his contributions to the Works. *Id.* ¶¶56, 58-60, 63, 90.

Marvel's control is illustrated vividly by the creation of Spider-Man. Although Appellants' Termination Notices claim Kirby assigned to Marvel the copyright in his supposed contribution to Spider-Man, it is undisputed that Lee assigned another artist to draw the initial Spider-Man story after finding Kirby's sketches unacceptable and that Steve Ditko drew the Spider-Man character who appeared in *Amazing Fantasy #15*. *Id.* ¶¶90-93.

### 2. Appellants' Opposition Rests On An Unsustainable Reformulation Of The Instance Test

#### a. Appellants' Attempted Reinvention Of The Instance Prong To Require A "Legal" Right To Supervise Is Legally Unsupported

Appellants mount a formalistic challenge to the instance test by drawing a meaningless distinction between Marvel's "legal right" to control a work's creation (said to be necessary but absent here) and its "practical purchasing power," "superior bargaining position," or right of "editorial supervision." Br. 12-13, 42-46. While Appellants contend this purported "legal right" requirement arises "[a]s a matter of law and logic," *id.* at 43, they nowhere articulate the contours of their proposed test, the meaningfulness of the distinction it attempts to draw, or any legal support beyond miscited case law. The governing precedents make clear that the extent of "legal" authority needed to be shown was Marvel's right to accept or reject the work done by Kirby pursuant to Marvel's assignments.

Appellants' thinly-veiled suggestion that the instance prong requires an express contract between the parties also was properly rejected by the district court, SA34, in line with governing precedent. *See Playboy*, 53 F.3d 549 (instance prong met without relying on express contract); *Picture Music*, 457 F.2d 1213 (same); *Archie Comic Publ'ns*, 258 F. Supp. 2d 315 (same); *see also Twentieth Century*, 429 F.3d 869 (same); *In re Marvel*, 254 B.R. 817 (same); *Nat'l Ctr. for Jewish Film, Inc. v. Goldman*, 943 F. Supp. 113 (D. Mass. 1996) (same).

> b.      Appellants Failed To Raise Any Genuine Issue Of Material Fact Regarding The Instance Prong

Appellants make no attempt to dispute the multitude of record facts dispositive of the instance test. Instead, they construct arguments predicated on supposed facts that, even if provable, are irrelevant to the analysis. One such red herring is Appellants' emphasis on the degree of Kirby's artistic contributions and freedom in the execution of his assignments. They argue that since Kirby assertedly "provided the origin stories and personalities of many of Marvel's most famous characters," this should preclude summary judgment; a variant of this refrain is Appellants' claim that Kirby "co-created" the Works. Br. 30-31, 34. The key to the instance analysis, however, is not measuring the degree of creative contribution made by the hired party, but rather determining the circumstances under which those contributions were rendered. The instance test is satisfied because Kirby, as the uncontested facts show, submitted all of his artwork pursuant

to assignments and based on scripts or plots discussed with Marvel before beginning to draw, and what came of those submissions – along with those of all other contributors – was subject to Marvel's control, JA(I)152-185 ¶¶54-55, 57-59, 64, 82-88, 97-105. Consequently, the degree of Kirby's artistic freedom is "legally irrelevant."[7] *See Fifty-Six Hope Road Music Ltd. v. UMG Recordings, Inc.*, No. 08 CIV. 6143(DLC), 2010 WL 3564258, at *10 (S.D.N.Y. Sept. 10, 2010) ("[T]hat Marley may have exercised artistic control . . . is legally irrelevant; what is dispositive is that Island [Records] had the contractual *right* to accept, reject, modify and otherwise control the creation of the Sound Recordings.") (emphasis in original); *Hogarth*, 2002 WL 398696, at *19 ("[T]hat Hogarth . . . was treated with deference and respect in the execution of the art is not sufficient to undercut the strong evidence that the Books were made at ERB's instance."); *In re Marvel*, 254 B.R. at 830 (artist's creation of new plots and characters in context of particular assignments from hiring party an "expected" activity falling within instance test); *Siegel*, 658 F. Supp. 2d at 1068.[8]

---

[7] Kirby concededly never initiated any of the story lines or characters implicated in the Works "on spec," *id.* ¶¶64, 115, *i.e.*, outside of the parameters of a project initiated and controlled by Marvel. Appellants' proffered expert Evanier so recognized: "Kirby and Lee sat down to discuss the plot and the storyline before Mr. Kirby actually began to draw the characters." JA(III)540; *id.* at 577 ("Stan and Jack had conferences before [Stan] sent [Kirby] off to draw").

[8] Appellants misunderstand the boundaries of copyright if they contend that Kirby's injection of ideas into the creative process somehow disqualifies the Works as works made for hire. Copyright concerns itself with the *expression* of

Appellants also repeatedly cite to supposed facts from outside the Time Period that they assert undermine the work-for-hire status of the Works – contentions that are temporally irrelevant to the claims made in this case and in any event prove, on analysis, to be specious. By way of example, Appellants refer to certain artwork claimed to have been published by other companies after it was allegedly "rejected" by Marvel. Br. 45, 51. They cite for this proposition the excluded testimony of Evanier relating to the 1971 publication of *The New Gods* by DC and the 1993 publication of *Captain Glory No. 1* by Topps. *Id.* Not only do these assertions relate to events well after the Time Period, Appellants, moreover, nowhere allege that either of these works was created pursuant to assignment by Marvel. In short, these unproven assertions do not remotely relate to the issue at hand: whether any of Kirby's 1958-1963 contributions to the Works were anything other than works made for hire.[9]

---

ideas, not ideas themselves. *See* 17 U.S.C. § 102(b) ("[i]n no case does copyright protection . . . extend to any idea"); *In re Marvel*, 254 B.R. at 832 (writer's claim of independent creation did "not account for the transition from a story idea to a story ready for publication"). Focusing on the relevant creative expression, the record makes plain that the Works were created at Marvel's instance.

[9] Appellants engage in similar temporally irrelevant advocacy in attempting to undermine Marvel's satisfaction of the expense test (discussed *infra*). References to Morrow's excluded testimony about his 2008 assistance reassembling what he claims was "rejected" Fantastic Four artwork Kirby drew in 1970 (several years after the Time Period), Br. 40, and to license agreements Appellant Lisa Kirby signed 14 years after Kirby's death (pertaining to artwork Appellants nowhere allege were created during the Time Period), *id.*, simply have no bearing on the

More generally, Appellants' protestations that the district court somehow ignored certain evidence, *id.* 32, likewise are meritless. The court performed an exhaustive review of the record and found no genuine issue of fact; it need not have enumerated all of its reasons for granting summary judgment. *Seitz v. DeQuarto*, 777 F. Supp. 2d 492, 495 (S.D.N.Y. 2011). Moreover, the declarations Appellants submitted – including the fact declarations the court supposedly "ignored" and the expert declarations it properly excluded – actually underscore Marvel's authority to supervise, accept, reject or modify the creation of its comic books. JA(V)1375 ¶11; JA(V)1381 ¶11; JA(VI)1387 ¶¶10-11; JA(VI)1393 ¶11; CA(I)4 ¶9; *see* JA(III)781-783. For example, Neal Adams agreed with Dick Ayers and Joe Sinnott that freelancers made changes that Marvel required, JA(V)1375 ¶11, 1381 ¶11, 1387 ¶11, and statements by Appellants' experts also highlight Marvel's authority over what appeared in its comic books. JA(III)534-536, 560-562, 565-567, 584-585, 589, 591-593, 598.

### C.     The Undisputed Evidence Demonstrates The Works Were Created At Marvel's Expense

Marvel also met its burden to come forward with credible evidence that the Works were made at its expense. SA35-39.

---

issue here. Notably, these agreements all acknowledge throughout that Marvel owned the copyright in the subject works. *See* JA(VII)1693, 1705.

### 1. The Works Were Made At Marvel's Expense Because Marvel Bore The Risk Of Profitability

The "instancing" authority to supervise creation of a work is the critical element in a work-for-hire determination because the work is, by definition, produced to meet the standards of the employer, not that of the employee or contractor. The expense inquiry is, in contrast, "of minor importance," *Murray*, 566 F.2d at 1310, and meeting it is straightforward. This Court previously held that "[t]he simple fact that Playboy paid Nagel a fixed [per-page] sum for each of the works published in *Playboy* magazine is sufficient to meet the requirement that the works be made at Playboy's expense." *Playboy*, 53 F.3d at 555. Under this binding precedent, Marvel satisfies the expense requirement: It is undisputed that Kirby was paid a fixed per-page fee for all his contributions to the Works. SA36.

The Works were made at Marvel's expense because "the focus [of the expense prong] is on who bore the *risk* of the work's profitability." *Siegel*, 658 F. Supp. 2d at 1058 (emphasis in original); *see also Twentieth Century*, 429 F.3d at 881 (expense test satisfied where publisher "took on all the financial risk of the book's success, agreeing to pay [the author] a lump sum for writing the book, instead of negotiating a royalty deal"); *Hogarth*, 2002 WL 398696, at *20 (expense test satisfied where publisher took "full assumption of the risk of loss on the project"). It is uncontested that Marvel bore the sole financial risk of whether its

comic books – including the Works – would be successful.  JA(I)152-185 ¶19.  If a comic book sold well, Marvel profited; if not, Marvel bore any loss.  *Id.*

Kirby's compensation, in contrast, was completely unrelated to the Works' commercial success.  Appellants acknowledge Kirby "was paid on a per-page basis."  Br. 7.  He never received royalties or any other compensation contingent on the profitability of his contributions.  *See* JA(I)152-185 ¶¶49, 62.  Indeed, Marvel paid Kirby when he submitted his work, before completion (let alone publication) of the comic book and before its commercial success could be known.  *Id.* ¶20.

Other undisputed facts confirm the Works were made at Marvel's expense.  Marvel bore all printing and publication costs, and engaged and compensated a team of contributors to complete its comic books, including writers, pencillers, inkers, letterers, colorists and production staff, whose work was supervised by Lee in his capacity as salaried editor.  *Id.* ¶¶19, 26-30.  Thus, Marvel bore the expense of compensating other contributors to the final product, *Twentieth Century*, 429 F.3d at 881, and the supervisory role that satisfied the instance prong was carried out by a salaried employee of the hiring party, *Hogarth*, 2002 WL 398696, at *20.

### 2. *Appellants' Proposed Novel Expense Test Is Incorrect As A Matter Of Law*

Appellants level their primary attack on the outcome below on the district court's disposition of the expense prong.  They do not dispute Marvel paid Kirby a

fixed, per-page rate for his contributions to each Work it published, nor do they attempt to reconcile their position with *Playboy*'s holding that this satisfies the expense requirement. Instead, Appellants proffer an invented expense test that is contrary to precedent and would produce nonsensical results.

Appellants argue the Works were not made at Marvel's expense because Marvel supposedly was not obligated to pay Kirby for his contributions unless it "cho[se] to accept or publish [the] submitted work." Br. 37-38. According to Appellants, "[w]hen a company like Marvel pays only for that freelance material it deems acceptable, that is a *purchase* — the antitheses of 'work for hire.'" *Id.* at 41. This is, of course, not the case since, under the 1909 Act, "[w]henever one person bought authorship services from another, the seller was a copyright 'employee' and the buyer was a statutory 'author.'" *Easter Seal*, 815 F.2d at 327. In any event, Appellants' construct is a purely hypothetical one because there is no evidence Kirby was ever denied payment for any of his contributions to the Works. To the contrary, Lee's testimony is undisputed that all of Marvel's freelancers, including Kirby, were always paid for their completed work, regardless of whether it ultimately was published. JA(I)152-185 ¶¶47-48, 61.

What is more, the proposition that the party who induced creation of a work must pay for even *unacceptable* work product or else forfeit its claim to work-for-hire ownership of it would create perverse results that would place the expense test

33

at war with the instance test, which lies at the core of the work-for-hire doctrine. As this Court observed in *Playboy*, 53 F.3d at 554, the "hallmark" of work-for-hire is "power to control or supervise the creator's work." The power to condition payment on completion of acceptable work is simply a means of supervising or directing the work's creation. Marvel hired artists, including Kirby, to draw artwork Marvel assigned to them; by definition, their job was not completed, and they were not entitled to compensation, until they submitted acceptable work that fulfilled the assignment. JA(I)152-185 ¶¶23, 54-55. Exercising this "instancing" authority cannot disqualify Marvel from meeting the expense prong of the analysis. To hold otherwise would be to create a work-for-hire catch-22, overruling decades of law and settled expectations, under which entities could never obtain the benefits of the work-for-hire doctrine.

A similar confusion about the underpinnings of the 1909 Act work-for-hire doctrine afflicts Appellants' discussion of the risk of loss. Appellants misapprehend the sole risk criterion relevant to the expense test by suggesting that Kirby bore the risk of "creation" (as opposed to publication) because he assertedly would not have been paid if his work was rejected. Br. 36-37. But the expense test depends upon who, as between the commissioning party and independent contractor, bore the risk of success of the final published work. *Twentieth Century*, 429 F.3d at 881; *Siegel,* 658 F. Supp. 2d at 1058; *Hogarth*, 2002 WL 398696, at

*20. Appellants' contrary proposed rule, premised on the possibility that a freelancer might not be paid to his satisfaction in all circumstances, is not the law. Indeed, such a test would undermine the key determinant this Court held dispositive of the expense inquiry: that the employer paid a fixed sum for the contributor's work. *Playboy,* 53 F.3d at 555.[10]

This Court has categorically rejected the related argument that Marvel fails to meet the expense test because Kirby paid for his own supplies, Br. 39, 42. Under the 1909 Act, whether an artist provided his own tools or worked his own hours "ha[s] no bearing on whether the work was made at the hiring party's expense." *Playboy*, 53 F.3d at 555.

Ultimately, the undisputed fact that Marvel paid Kirby a fixed, per-page amount for his contributions and bore the risk of the Works' success satisfies the expense requirement.

---

[10] Not surprisingly, the authorities Appellants cite provide no support for their contorted view of the expense test. Any "commitment to pay" discussed by this Court in *Playboy*, *see* Br. 38, involved works governed by the 1976 Act and is thus irrelevant here. *See* 53 F.3d at 563. Similarly, the "turn-down fee" discussed by the district court on remand in *Playboy*, *see* Br. 37, was actually evidence that Playboy was "the motivating factor" in the creation of the work at issue such that the work was done at Playboy's instance. *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 715-16 (S.D.N.Y. 1997). The Ninth Circuit in *Twentieth Century* did not even mention that the author received a "nonrefundable" cash advance, *see* Br. 37; it emphasized that the author received "a lump sum . . . instead of . . . a royalty deal." 429 F.3d at 881. Finally, the advertisers in *Brattleboro* were not "obliged" to pay the newspaper for creating unused work. *See* Br. 37. The charge for preparing advertisements was included in the "price paid by the advertisers for publishing." *Brattleboro*, 369 F.2d at 568.

### D. Appellants Cannot Defeat Summary Judgment Merely By Impugning The Credibility Of Stan Lee

Rather than sustain their burden to raise genuine issues of material fact, Appellants instead cast a smokescreen – they assert the district court's judgment cannot stand because it relied exclusively on Lee's testimony, which they contend was somehow improperly tainted. But that argument rests on a specious legal basis for reversal and misrepresents both the breadth of the district court's careful factual analysis and the nature of Lee's testimony and other evidence corroborating it. Br. 28-32.

To begin, the theory is legally flawed. A party "cannot defeat summary judgment . . . merely by impugning [a witness's] honesty." *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999); *see Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) ("Broad, conclusory attacks on the credibility of a witness will not, by themselves, present questions of material fact."). The non-moving party must come forward with *evidence* creating a factual issue, and Appellants have none.

Equally fundamentally, the district court decision was not singularly based on its assessment of Lee's credibility, as Appellants suggest. In its thorough review of the record, the court cited and relied upon: documentary evidence (including a detailed outline of the first *Fantastic Four* story); testimony of Kirby's contemporaries including Lieber, Romita, Thomas and Appellants' witnesses

Ayers, Sinnott and Steranko; and importantly, testimony from Neal Kirby himself. *See supra* 13-14. And while Appellants assert Lee should be disbelieved because of "financial ties" to Marvel and Disney, Br. 29, they fail to identify any record evidence that would raise a genuine issue of material fact. To the contrary, the court referenced accounts Lee gave consistently during the Time Period and throughout the last half-century – made at times when these statements were arguably against Lee's own interest, as he wrote most of Marvel's comic books during the Time Period and could have attempted to assert the same authorship rights Appellants assert here. JA(III)695-757, 787-793; Singer Decl. Exhibit 11. Such accounts are also consistent with Kirby's sworn statement that "whatever [he] did for [Marvel] belonged to [Marvel] as was the practice in those days." JA(I)152-185 ¶69.

Because this extensive record of multiple corroborating pieces of evidence left no material fact in dispute, the court properly granted summary judgment.[11]

### E.  <u>Appellants Cannot Rebut The Presumption That The Works Are Works Made For Hire</u>

Because Marvel has adduced evidence well beyond "some credible evidence" that the Works were created at its instance and expense, *Twentieth*

---

[11] Consequently, the Court should deny Appellants' baseless request for reassignment of this action if it is remanded. *E.g.*, *Spiegel v. Schulmann*, 604 F.3d 72, 83 (2d Cir. 2010) ("Reassignment of a case on remand should occur only when the facts might reasonably cause an objective observer to question the judge's impartiality.").

*Century*, 429 F.3d at 877, the burden shifts to Appellants to rebut the resulting

"almost irrebuttable presumption" that the Works were works made for hire.

*Hogarth*, 342 F.3d at 158.  To overcome this presumption, Appellants must

establish by a preponderance of the evidence that Marvel and Kirby both intended

that his contributions to the Works would *not* be so regarded – *i.e.*, point to an

unambiguous contemporaneous agreement that the copyrights in his contributions

would vest in Kirby and not Marvel.  *Playboy*, 53 F.3d at 554-55; *see Twentieth*

*Century*, 429 F.3d at 881.  They have completely failed to do so.[12]

### 1. Assignment Language In An Agreement Outside The Relevant Time Period Is Insufficient To Evince A Contrary Intent

Appellants' effort to rebut the work-for-hire presumption relies principally

on a document executed between Kirby and Marvel some nine years after the Time

Period, which cannot by definition provide *contemporaneous* evidence of the

parties' intent as to the copyright status of Kirby's contributions to the Works and

so is of limited, if any, probative value.  *See Fifty-Six Hope Road*, 2010 WL

---

[12] To the contrary, Kirby himself acknowledged the work-for-hire status of his contributions.  For example, shortly after the Time Period, Kirby signed an affidavit and copyright renewal registrations swearing that *Captain America* (not at issue here but to which he had also contributed) was a work made for hire. JA(I)152-185 ¶69.  Additionally, in a 1986 article, Kirby wrote that he sought only "proper credit for [his] role in the creation" of certain of the Works, and that this had "nothing to do with copyright ownership."  *Id.* ¶76.  Moreover, there is no evidence Kirby ever sought to register any of the copyrights in any of the Works in his own name.  *Id.* ¶12.

3564258, at *11 ("post hoc conclusory assertions of the intent of the parties would not alter the conclusions that the [works] were works made for hire"); *Simon*, 310 F.3d at 290-91. In any event, as the district court noted, the 1972 Agreement so relied upon "is the antithesis of evidence" contradicting the work-for-hire presumption. SA40. In it, Kirby expressly "acknowledge[d] and agree[d] that all his work on the MATERIALS [including the Works], and all his work which created or related to the RIGHTS was done as an employee for hire of" Marvel. JA(I)152-185 ¶10. A different, belt-and-suspenders provision in the agreement in the nature of a quitclaim that purports to assign to Marvel "any and all right, title and interest [Kirby] may have or control" in work created for Marvel, *id.* ¶9, was recognized by the district court not to constitute a statement that Kirby, in fact, owned any rights in the Works. SA42. The only definitive statement is that the works were works made for hire.

In any event, numerous courts have found purported assignment language insufficient to rebut the work-for-hire presumption without additional "evidence as to the circumstances or intendment of its execution." *Twentieth Century*, 429 F.3d at 881 (quoting *Lin-Brook*, 352 F.2d at 300); *see Hogarth*, 2002 WL 398696, at *23 (contract language "neither proves nor disproves that the parties intended something other than a work-for-hire relationship") (quoting *Playboy*, 53 F.3d at 557). No such additional evidence exists here.

Contrary to Appellants' insinuations, neither Marvel nor the district court sought to rely on the 1972 Agreement in a manner contrary to this Court's holding in *Simon*. There, writer Joe Simon alleged he had conceived, drawn and executed a Captain America comic as an "independent" project and "shopp[ed] it around to various publishers," with Marvel ultimately buying it "for a fixed page rate plus a twenty-five percent share of the profits of the comic books." *Id.* at 282. Many years later, Marvel and Simon executed an agreement stating the work was made-for-hire. *Id.* at 283-84. This Court denied Marvel's summary judgment motion because, unlike in this case, in *Simon* the writer had proffered admissible evidence that the actual relationship between the parties was otherwise, leaving the issue for trial. *Id.* at 292.

Here, given the wealth of contemporaneous evidence of the parties' relationship, Marvel need not (and does not) resort to a years-later agreement to establish the presumption that Marvel owned the Works as works made for hire.[13] Marvel and the district court cited the 1972 Agreement as, if anything, corroborative of the contemporaneous record evidence.

---

[13] The post-1972 agreements on which Appellants rely are similarly unavailing. Br. 48-49. Most did not even involve Kirby. The 1975 agreement between Marvel and Kirby applied only to contributions Kirby was to produce from 1975 to 1978 and thus does not bear on whether the Works, all published during the Time Period, were works made for hire. JA(IV)874-882; SA45.

### 2. Language In Check Legends Involving Third Parties And Outside The Time Period Is Insufficient To Show A Contrary Intent

Similarly meritless is Appellants' effort to overcome the work-for-hire presumption by pointing to legends affixed on checks issued 10 or more years after the Time Period to freelancers other than Kirby, Br. 47-48, which have no bearing on whether *Kirby's* contributions to the Works *during the Time Period* were works made for hire. *See Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 331-32 (refusing to draw inference of agreement to contrary without direct evidence of relevant check legend language; noting where check language is not unambiguous, "the presumption of a work for hire relationship prevails"). To draw the inference Appellants advocate from such check legends would be error. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) ("[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact (that is known to exist).").[14]

---

[14] Appellants' suggestion that Marvel's purported concern with sales tax liability for "purchases" of artwork shows a contrary intent, Br. 50-51, fails most notably because New York State's sales tax statute did not exist during the Time Period (and is expressly not retroactive), *see* N.Y. Tax Law § 1106, JA(VIII)2049-2055 at 2053; moreover the very document Appellants cite states Kirby "acknowledge[d] that Marvel owns the copyright to the work," JA(VIII)2049-2055 at 2051.

**F.** **The Exclusion Of Appellants' Proffered Expert Testimony Was Proper And Such Evidence Did Not In Any Event Create Any Material Issue Of Fact**

The district court properly exercised its wide discretion to exclude the proffered expert testimony of Mark Evanier and John Morrow for several reasons, any one of which is sufficient. *See DiBella v. Hopkins*, 403 F.3d 102, 121 (2d Cir. 2005); SA10-15. Appellants' "experts" did not offer evidence of "industry custom and practice," Br. 58, which would be irrelevant in any case; rather, as the district court observed, both of them concededly lacked any firsthand knowledge to support their testimony, which was based on their review of secondary sources and interviews. SA13. Thus, not only was the proffered testimony not "helpful to the [factfinder] in comprehending and deciding issues beyond the understanding of a layperson," *DiBella*, 403 F.3d at 121, it also sought impermissibly to "call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007); *In re Marvel*, Trial Transcript at JA(IV)1008-1013 (excluding Evanier's testimony as hearsay after hearing it).

Moreover, both experts sought to usurp the factfinder's role by opining on the motivations, intent and credibility of others. *E.g.*, JA(V)1105 ("It is extremely doubtful that either Marvel or freelance artists, such as Jack Kirby, . . . had any

understanding or intent that their freelance material . . . was somehow 'work made for hire'"); *id.* ("I have great respect and personal affection for Stan Lee, but I disagree with the accounts he has sometimes given" of the creation of certain of the Works); JA(V)1152 ("I do not believe that Goodman, Lee, Marvel or the freelance artists . . . thought that the material they created was 'work made for hire.'"); *Nimely v. City of N.Y.*, 414 F.3d 381, 398 (2d Cir. 2005) ("[E]xpert opinions that constitute evaluations of witness credibility . . . are inadmissible under Rule 702."); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").  Finally, neither Evanier's nor Morrow's testimony was based on any methodology whatsoever, let alone one sufficient to withstand scrutiny under Rule 702.  *See Nimely*, 414 F.3d at 396-97; JA(IV)953-58, 970, 975, 1026-1027, 1073-1074.

Any one of these bases was independently sufficient to exclude the "expert" testimony; accordingly, the district court did not abuse its discretion.  *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 41 (2d Cir. 2004), *cert. denied*, 546 U.S. 822 (2005).[15]  Moreover, as the district court acknowledged, SA32-34 & nn.3-4,

---

[15] The district court likewise was entitled to ignore Evanier's testimony as a purported "percipient" witness, as he admittedly lacked any personal knowledge of any of the relevant facts since he met Kirby for the first time in 1969, years after the Time Period, and instead learned of the facts purely through hearsay statements

neither Evanier's nor Morrow's testimony would raise any genuine issue of material fact, even if they were to be considered. Both "experts" actually corroborated the record evidence on the salient facts underlying the instance-and-expense test. For example, Evanier and Morrow explicitly admitted, among other things, that:

- Martin Goodman had the final say on what Marvel published, JA(III)560-562, 565-566, 589;

- Marvel bore the financial risk of the success of its comic books, JA(III)555-557;

- Lee determined which artists and writers would work on particular comic books and made reassignments when necessary, JA(III)567, 584-585, 591;

- Lee had the authority to accept, reject or require revisions to artwork, JA(III)534-536, 562;

- Kirby did not begin to draw until after he discussed the idea and plot with Lee, JA(III)540-542, 577; JA(VI)1452;

- Lee maintained the authority to, and frequently did, make changes to Kirby's artwork and altered scripts and concepts, JA(III)591-593, 598; and

of others. JA(IV)953-956, 962-968, 974, 978, 981-992, 997-999, 1003-1007; JA(V)1102-1103.

- during the Time Period, artists, including Kirby, did not receive royalties and were paid a fixed per-page rate, JA(III)548-550; JA(V)1103, 1151-1152.

Accordingly, even were the Court to find the exclusion of Evanier and Morrow was in error, any such error was immaterial to the ultimate holding that the Works were works made for hire.

## II.    THE DISTRICT COURT CORRECTLY DENIED THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Appellants assert one additional basis for overturning the judgment.  They contend the district court lacked personal jurisdiction over the two California Appellants (Lisa and Neal Kirby), who are supposedly necessary and indispensable parties, so the entire action must be dismissed.  As the district court held, this argument, too, is baseless.  SA53-68.

### A.    <u>Personal Jurisdiction Over Lisa And Neal Kirby Is Proper Because This Litigation Arises From Their Purposeful Activity In New York</u>

To survive a motion to dismiss on personal jurisdiction grounds, Marvel need only have made a *prima facie* showing of jurisdiction below, with all the allegations and doubts construed in Marvel's favor.  *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

Personal jurisdiction is governed by the rules of the forum state, here New York.  *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997).  New

York's long-arm jurisdiction statute, C.P.L.R. § 302(a)(1), provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state," if the claim arises out of that transaction.[16]

Transacting business is not limited to "profit-seeking" or "commercial" activities. *Madden v. Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers*, 889 F. Supp. 707, 710 (S.D.N.Y. 1995). Rather, a "nondomiciliary 'transacts business' under CPLR 302(a)(1) when he 'purposefully avails himself of the privilege of conducting activities within New York.'" *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). Thus, "CPLR 302(a)(1) jurisdiction is proper . . . so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007).

As the district court correctly determined, it had personal jurisdiction over Lisa and Neal Kirby because they, together with their siblings, purposefully sent multiple self-executing Termination Notices to Marvel and a licensee in New York. Supp A-23-67. Pursuant to Section 304(c) of the 1976 Act, those

---

[16] Only the first prong of this analysis – transacting business in the state – is in issue here because Appellants do not contest the district court's conclusion that Marvel's claim arises out of their contacts with New York. *See* SA64. Nor do Appellants dispute that the exercise of personal jurisdiction over Lisa and Neal Kirby comports with the Due Process Clause. *See id.*

Termination Notices purported to divest Marvel, on the specified dates, of its exclusive ownership of the Works – an event which, if left unchallenged, would destabilize Marvel's business operations, impair its relationships with licensees, and divert to Appellants the right to collect sizable royalties to which Marvel and its licensees have long been entitled.[17]  Appellants freely admit they sent Termination Notices to licensees of the Works – including in New York – in the hope of replacing Marvel in its business dealings with the licensees.  Supp A-3-22 ¶32; SA59.

Each of the 45 Termination Notices was sent to 11 Marvel entities in New York – current Plaintiffs or their affiliates, JA(I)88 ¶4, JA(VI)1409-10 – and thus were hardly "random," "fortuitous," or "purely ministerial" contacts with the State, as Appellants suggest.  Br. 16.  Although Appellants assert the Termination Notices had no "New York specific-effect," *id*. at 17, they have targeted the center of gravity of Marvel's publishing business, which is, and always has been, New York.[18]  Accordingly, New York is where "[t]he greatest import of the Termination

---

[17] That Appellants have not yet taken the ministerial step of filing the Termination Notices with the Copyright Office has no jurisdictional significance.  *See* Br. 18 n.1.  Once the notices were served, Marvel had no option but to protect its rights and those of its licensees.

[18] Appellants incorrectly assert that no Termination Notice was served on Plaintiffs-Appellees in New York.  Br. 16.  In fact, Plaintiff-Appellee Marvel Worldwide, Inc. (formerly known as Marvel Publishing, Inc., *see* Supp A-1-2) was served with the Notices at its New York headquarters.  Supp A-23-67.

Notices will be felt by Marvel and its affiliates." SA67. Moreover, all of the conduct at issue in this litigation, including producing and developing the Works, occurred here. Kirby's contributions to the Works were done in New York, and two of his four children (half the Appellants) live in New York.[19]

By sending Termination Notices to New York designed to disrupt and divert license fees from Marvel's New York-based business, Appellants purposefully transacted business in this State. *See Andy Stroud, Inc. v. Brown*, No. 08 Civ. 8246(HB), 2009 WL 539863, at *5 (S.D.N.Y. Mar. 4, 2009) (personal jurisdiction was proper where defendant "represented to . . . a New York corporation[] that [defendant] should be sent royalties . . . caus[ing] [the company] to retain custody of property to which [plaintiff] claims ownership"). The Termination Notices were not akin to cease-and-desist letters or other assertions of rights, as Appellants suggest. Br. 17. As the district court observed, the simple act of serving the Termination Notices itself divested Marvel of its intellectual property rights, absent legal action by Marvel to protect those rights. SA60-62. While Appellants attempt to elide the distinction between notices that merely assert a purported right, with no self-effectuating force or effect upon the recipients' business or business relationships, and actions directed into a jurisdiction that, if not acted upon,

_____

[19] This case is thus distinct from *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 420-21 (S.D.N.Y. 2010), in which the center of gravity of the transaction was "indisputably . . . well outside" New York. *See* Br. 16-17.

threaten to have such effect, the cases do not. *Compare* cases cited by Appellants such as *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) (sending one letter threatening unspecified litigation insufficient for § 302(a)(1)), Br. 17-18, *with Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1082 (10th Cir. 2008) (notice of claimed infringement sent to eBay distinguishable from cease-and-desist letter because notice "purposefully caused the cancellation of [plaintiffs'] auction and allegedly threatened their future access to eBay and the viability of their business.") and *Bancroft & Masters, Inc. v. Augusta National Inc.*, 223 F.3d 1082, 1087-89 (9th Cir. 2000) (same where notice "forced [plaintiff] to bring suit or lose control of its website").[20]

Appellants' claim that "other legally-effective communications" do not suffice for personal jurisdiction, Br. 18, is unsupported by the authority on which they rely. In *Toledo Peoria & Western Railway Corp. v. Southern Illinois Railcar Co.*, 84 F. Supp. 2d 340 (N.D.N.Y. 2000), the court denied a motion to dismiss for lack of personal jurisdiction, because "the fact that the contract . . . was renewed

---

[20] Appellants attempt to distinguish *Dudnikov* and *Bancroft* on the ground that they involved tortious conduct. Br. 19. But the distinction drawn by both courts between mere assertions of rights (like cease-and-desist letters) and acts that interdict future business operations (like serving the Termination Notices) is unrelated to the act's wrongful character. *See Dudnikov*, 514 F.3d at 1082; *Bancroft*, 223 F.3d at 1089.

via telephone and facsimile in New York weighs decisively in favor of this Court exercising jurisdiction."[21] *Id.* at 343.

Appellants also contend personal jurisdiction is improper because they were "required" to serve the Termination Notices in New York, Br. 16, but this Court has already rejected this argument as a basis for declining jurisdiction. *See Cutco*, 806 F.2d at 368 (determining defendant "purposefully availed himself of the privilege of conducting activities in New York" by, *inter alia*, making "required" payments of royalties and fees to New York) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985)).[22]

---

[21] In *DNT Enterprises, Inc. v. Technical Systems*, 333 F. App'x 611 (2d Cir. 2009), this Court assumed sending a letter to New York terminating a contract could "constitute[] purposeful availment of New York laws," but determined the case before it involved a different subject matter. Other cases cited by Appellants for this point did not involve self-executing communications that altered the parties' rights or business relationships. *See, e.g.*, *Sternberg v. Nathan*, No. 96-9232, 1997 U.S. WL 225895, at *2 (2d Cir. May 7, 1997) (receiving telephone calls and faxing "a letter"); *Nat'l Sun Indus., Inc. v. Dakahlia Commer. Bank*, No. 95-7961, 1997 WL 218789, at *2 (2d Cir. May 2, 1997) (in a multi-foreign transaction, allowing New York bank to reimburse overseas payment).

[22] *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501 (2007), is not to the contrary. *See* Br. 17. It determined personal jurisdiction was absent where the minimal contacts with New York were "merely incidental to the prosecution of a foreign" libel action and the asserted "chilling [of] plaintiff's speech" in this State resulted only from the "[foreign court's] remedy and plaintiff's unilateral activities in New York." *Ehrenfeld*, 9 N.Y.3d at 508-511. Here, in contrast, ownership of the copyrights and interests at stake in this litigation depends on conduct that occurred exclusively in New York; Marvel's publishing business is centered in New York; and Appellants purposefully projected themselves into New York to divert Marvel's business opportunities to themselves.

In any event, personal jurisdiction exists over all Appellants for a separate reason that the district court found unnecessary to reach – they are asserting rights derivative of Kirby's, who indisputably could have been sued here.  SA64. Appellants' claimed interests in the Works arise solely from their relationship to Kirby, a New York resident at the time he created the Works in New York.  *See* 17 U.S.C. § 304(c)(2)(B).  Kirby's jurisdictional status therefore inures to Appellants as his successors in interest.  *See Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 (2d Cir. 1978) (successor to copyright interests inherited predecessor's position and was bound by predecessors' inaction with respect to laches defense); *G.H. Bass & Co. v. Wakefern Food Corp.*, No. 91 Civ. 2683(RWS), 1991 WL 285622, at *2-3 (S.D.N.Y. Dec. 31, 1991) (finding personal jurisdiction over contributory infringer even though it did not manufacture product, was not authorized to do business in New York, and never maintained inventory there); *Levi Strauss & Co. v. Textiles Y Confecciones Europeas, S.A.*, 222 U.S.P.Q. 971, 974-75 (S.D.N.Y. 1983) (exercising long-arm jurisdiction over Spanish company that did business exclusively in Spain and whose sole connection to New York was sale of goods through New York-based distributor).

This outcome does not "chill" the exercise of copyright termination rights, Br. 20-21; it simply means that when Appellants wrongfully assert such "rights" in New York, based upon events that occurred exclusively within New York, to

misappropriate the profits from Marvel's New York-based business, they can hardly feign surprise that New York courts would adjudicate the controversy.

### B. Lisa And Neal Kirby Are Neither Necessary Nor Indispensable Parties

Having concluded Lisa and Neal Kirby are amenable to jurisdiction in New York, the district court did not reach the issue of whether they are "required" (or necessary) parties, or whether "in equity and good conscience" the action should be dismissed rather than "proceed among the existing parties." *See* Fed. R. Civ. P. 19(a), (b). As the party moving for dismissal, Appellants must show the interest of the missing parties would not be adequately protected in their absence. *Mattera v. Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 74 (S.D.N.Y. 2006).

Appellants assert only a single, incorrect theory as to why Lisa and Neal Kirby are necessary parties – because "they 'claim an interest in the subject matter of the action' and disposition in their absence could 'impair or impede' that interest."[23] Br. 21 (quoting Fed. R. Civ. P. 19(a)(1)(B)(i)). As this Court has explained, however, "[i]t is not enough . . . to have an interest, even a very strong interest, in the litigation. . . . Rather, necessary parties under [Rule 19(a)(1)(B)(i)

---

[23] Appellants do not dispute that the district court could "accord complete relief" to all the parties in Lisa and Neal Kirby's absence, or contend that the remaining parties would face a "substantial risk" of inconsistent obligations. Fed. R. Civ. P. 19(a)(1)(A), (B)(ii). Indeed, Appellants concede that "a ruling against Barbara and Susan Kirby would block Lisa and Neal Kirby from exploiting their [purported] copyright interest," Br. 21-22, since Section 304(c) of the 1976 Act requires a majority of the statutory claimants to effectuate terminations.

are only those parties whose ability to protect their interests would be impaired *because of* that party's absence from the litigation." *Mastercard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006) (emphasis in original).

The absence of the California-resident Appellants would have no effect upon the litigation and thus would not impede their interests "as a practical matter." Fed. R. Civ. P. 19(a).[24] Their New York siblings, as to whom personal jurisdiction is indisputable, share the identical interests and are represented by the same counsel. As numerous courts have held, Rule 19(a) is inapplicable where, as here, parties remaining would adequately represent the absent party's interest. *See, e.g.*, *Washington v. Daley*, 173 F.3d 1158, 1167-68 (9th Cir. 1999); *Gwartz v. Jefferson Mem'l Hosp., Ass'n*, 23 F.3d 1426, 1429 (8th Cir. 1994); *Mark E. Mitchell, Inc. v. Charleston Library Soc'y*, 114 F. Supp. 2d 259, 263 n.8 (S.D.N.Y. 2000).

Even if Lisa and Neal Kirby were "required" parties, they are not indispensable, so the action would simply proceed without them. *See* Fed. R. Civ. P. 19(b) (no dismissal if "in equity and good conscience, the action should proceed"). The bar for dismissal under Rule 19(b) is high: it is "ordered only when . . . serious prejudice or inefficiency will result." 7 Charles Alan Wright et al.,

---

[24] *See* 4 James W. Moore et al., Moore's Federal Practice, § 19.03[3][c] (3d ed. 2011) ("The assessment of the possible impairment to an absentee's ability to protect its interest is a pragmatic one. . . . The harm cannot be conjectural; . . . [it] must be such that nonjoinder would be unfair.").

Federal Practice & Procedure § 1609 (3d ed. 2011).[25]  Appellants, whose goal is to litigate the issues in California, do not come close to meeting this standard.

To the contrary, concerns of efficiency and judicial economy weigh heavily against dismissal, which would restart an action that has been litigated to final judgment.  As this Court explained when applying Rule 19(b), "[o]nce the district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts are directed to salvage jurisdiction where possible."  *Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co*., 312 F.3d 82, 89 (2d Cir. 2002).  This is especially so here because there is no reason to think a different result would be reached in the Ninth Circuit – whose law relating to 1909 Act works-for-hire parallels that of this Court – where Appellants have "consented" to jurisdiction.

Rule 19(b) sets out four factors to consider, all of which support proceeding with the action.  The first two concern prejudice that may result from a judgment rendered in the necessary party's absence.  *See* Fed. R. Civ. P. 19(b)(1), (2).  Contrary to Appellants' suggestion, the mere fact that an adverse ruling against the two remaining siblings would preclude Lisa and Neal Kirby from asserting their

---

[25] *See also Holland v. Fahnestock & Co*., 210 F.R.D. 487, 494-95 (S.D.N.Y. 2002); Moore, *supra* § 19.02[3][c] ("[C]ourts are understandably reluctant to dismiss because of a defect in party joinder.  The thrust of the Rules is to decide cases on their merits, not on technicalities.  Thus, courts generally will dismiss only when serious harm may result from nonjoinder. . . .").

claimed termination right does not constitute "prejudice" under Rule 19(b). Br. 21-22. Judgments routinely determine rights of absent persons in privity with the parties.[26] And the preclusion here would flow not from Lisa and Neal's absence from the litigation but from ordinary principles of collateral estoppel and from the operation of the Copyright Act, which requires a majority of heirs to act in unison.

Moreover, whether the caption names two Kirby siblings or four, the same counsel will make the same arguments supporting the same interests. As this Court has explained, an action should not be dismissed due to a party's absence if another defendant "could champion its interest." *CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 160 (2d Cir. 2009). This is particularly so where the absent and remaining parties are siblings, "represented by the same counsel, and the defendants have not alerted [the Court] to any evidence that suggests [their] interests are adverse." *Id.*; *see Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493, 497 (2d Cir. 1977) (finding no prejudice because "counsel for those remaining in the case will be no less vigorous in their advocacy because they represent two fewer persons").

---

[26] *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 547 F.3d 109, 112 n.1 (2d Cir. 2008) ("The fundamental notion of the doctrine of collateral estoppel . . . is that an issue of law or fact actually litigated and decided . . . may not be relitigated in a subsequent suit between the same parties or their privies."); *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 92 (2d Cir. 2005) ("[t]he requirements for privity under federal law [are] identity of interests and adequacy of representation").

As for the third factor, whether the court could render an "adequate" judgment in the parties' absence, the answer is clearly yes, the judgment would be no different than if all four Appellants were present. Appellants' claim that the judgment would be "inadequate" because assertedly it "would not bind Lisa or Neal Kirby," risking "inconsistent verdicts," Br. 22, ignores the judgment's collateral-estoppel effect.[27] Appellants have already conceded that Lisa and Neal Kirby could not exercise their purported termination right after an adverse ruling against their siblings, *id.* at 21-22, so there could be no further actions adjudicating this same issue.

Appellants' final contention is perhaps the most revealing. In their view, this case can be litigated only in a forum where the nonresident heirs have "consented" to jurisdiction. *Id.* at 22. Accepting this logic would mean Marvel could not challenge the Termination Notices at all unless Appellants were willing to consent to jurisdiction. It would also allow Appellants to dictate the forum in which the dispute may be litigated, eviscerating the well-established deference courts afford plaintiffs' choice of forum. *See, e.g.*, *Gross v. British Broad. Corp.*, 386 F.3d 224, 230 (2d Cir. 2004). This is not how Rule 19 – with its roots deep in equitable doctrines – was designed to operate. *See* Wright, *supra* § 1601; SA67

---

[27] The only cases Appellants muster to support their assertion are ones involving unique copyright interests of third parties. *See Plunket v. Estate of Doyle*, No. 99 Civ. 11006(KMW), 2001 WL 175252 (S.D.N.Y. Feb. 22, 2001); *Wales Indus., Inc. v. Hasbro Bradley, Inc.*, 612 F. Supp. 510 (S.D.N.Y. 1985).

("Defendants' attempt to dictate the forum for this litigation by choosing which Defendants will consent to which jurisdiction offends equity and fairness.").

## CONCLUSION

For the foregoing reasons, the Court should affirm the order granting summary judgment to Plaintiffs-Appellees and the order denying Defendants-Appellants' motion to dismiss.

Dated:     New York, New York          By:     /s/  R. Bruce Rich
           April 5, 2012
                                        WEIL, GOTSHAL & MANGES LLP
                                        R. Bruce Rich
                                        James W. Quinn
                                        Randi W. Singer
                                        Gregory Silbert
                                        767 Fifth Avenue
                                        New York, NY 10153
                                        Tel:  (212) 310-8000
                                        Fax: (212) 310-8007

                                        HAYNES AND BOONE, LLP
                                        David Fleischer
                                        30 Rockefeller Plaza, 26th floor
                                        New York, NY 10112
                                        Tel: (212) 659-7300
                                        Fax: (212) 918-8989

                                        *Attorneys for Plaintiffs-Appellees and Counterclaim-Defendants-Appellees*

# CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,920 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).  The word count was measured by the word-processing program used to prepare the brief, Microsoft Word.

This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated:  New York, New York        By:   /s/  R. Bruce Rich
       April 5, 2012

WEIL, GOTSHAL & MANGES LLP
R. Bruce Rich
James W. Quinn
Randi W. Singer
Gregory Silbert
767 Fifth Avenue
New York, NY 10153
Tel:  (212) 310-8000
Fax: (212) 310-8007

HAYNES AND BOONE, LLP
David Fleischer
30 Rockefeller Plaza, 26th floor
New York, NY 10112
Tel: (212) 659-7300
Fax: (212) 918-8989

*Attorneys for Plaintiffs-Appellees and Counterclaim-Defendants-Appellees*